# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### 1:21-cr-00070-MR-WCM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| ROBERT ALLAN BURNETTE | ) | |
| aka "Mater" | ) | |
| | ) | |
| _____ | ) | |

This matter is before the Court on Defendant's Motion to Suppress (Doc. 308), which has been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

## I.      Relevant Procedural Background

On August 3, 2021, a thirty-eight count Bill of Indictment was filed against twenty-three individuals. Doc. 3. In that document, Defendant Robert Allan Burnette aka "Mater" ("Defendant") was charged with three counts related to possessing with the intent to distribute methamphetamine, and one count of possessing a firearm in furtherance of a drug trafficking crime.

On December 5, 2021, Defendant filed the Motion to Suppress. Doc. 308. On December 29, 2021, the Government filed its response. Doc. 350.

A hearing was conducted on the Motion to Suppress on February 17, 2022.

## II. Factual Background

"When material facts that affect the resolution of a motion to suppress… are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings." United States v. Taylor, 13 F.3d 786, 789 (4th Cir. 1994). In doing so, the court determines "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." United States v. Gualtero, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (citing United States v. McKneely, 6 F.3d 1447, 1452-53 (10th Cir. 1993)).

### A. Evidence Presented

At the hearing, the Government called the following witnesses, all of whom are employed by the Haywood County Sheriff's Office: Detective Jordan Reagan (who is also assigned as a full-time task force officer with the Drug Enforcement Administration ("DEA")), Lieutenant Mark Mease, Deputy Jay Stoller, and Sergeant Ryan Smith.[1] Without objection, the Government introduced video footage of the subject traffic stop, and certificates of training relative to Deputy Smith's K9.

---

[1] At the time of the events in question, Detective Reagan had not yet become a DEA task force officer. In addition, Lt. Mease held the rank of sergeant and Sgt. Smith held the rank of deputy. Their previous ranks are referenced in this Memorandum.

Defendant called Detective Michelle Cagle, also of the Haywood County Sheriff's Office, as a witness.

## B. Factual Findings

Based on the information of record and as presented during the hearing, the undersigned finds the relevant facts to be as follows:

In November 2019, the DEA and the Haywood County Sheriff's Office were involved in an ongoing investigation focusing on methamphetamine trafficking in Buncombe County, Jackson County, Haywood County, and Georgia.

One individual, William Joseph Craig ("Craig"), was identified as a source of supply in North Carolina. Other individuals, including Angela Vance Carver ("Carver") and Defendant, were identified as suspected wholesalers.

### 1. The Stop of Carver

On November 1, 2019, Deputy West of the Haywood County Sheriff's Office performed a traffic stop of a motor vehicle after it ran a stop sign. Carver was the driver of that vehicle. During the stop, Deputy West requested the assistance of Deputy Smith, who came to the scene with his K-9, Bruno. Detective Reagan and one of his colleagues, Detective Phillips, also came to the scene, as did Sgt. Mease and Detective Cagle.

After the dog alerted to the odor of narcotics in the vehicle, Carver advised the officers that methamphetamine was in the glove box. Two bags

3

containing approximately 93 grams of actual methamphetamine were seized and Carver was arrested. Carver also admitted to having additional methamphetamine on her person. She was searched by Detective Cagle and that methamphetamine was found.

Following Miranda warnings, Carver was interviewed by Deputy West, Detective Reagan, and Detective Phillips. Sgt. Mease was also present. Carver stated that Craig, who lived in the Candler community of Buncombe County, was her source of supply. She additionally stated that she had obtained the methamphetamine found in her vehicle from Craig and planned to deliver it to Defendant, who had already paid Craig for it.

Carver also stated that Craig had given her the methamphetamine that was found on her person as payment for her delivery of the larger amount of methamphetamine to Defendant.

Carver consented to a search of her cell phone. That search revealed contact information for Defendant, Craig, and others as well as numerous text messages between Carver and Craig. Defendant was not mentioned in the text messages. Communications on Carver's phone also indicated that Carver owed Craig money for additional methamphetamine she had obtained from him.

### 2. The Stop of Defendant

On the following evening, November 2, 2019, a confidential informant contacted Detective Reagan and advised that Defendant would be meeting

Craig at the Taco Bell restaurant in Canton, North Carolina to purchase 2 ounces of methamphetamine. The informant further stated that Defendant would be driving a black Jeep motor vehicle that belonged to Defendant's girlfriend, Stephanie Trull ("Trull").[2]

In response, Detective Reagan and Detective Phillips began conducting surveillance on the Taco Bell restaurant. When Defendant did not appear after approximately one hour, the detectives traveled to Craig's residence where they saw a black Jeep in the driveway. A check of the tag indicated that it belonged to Trull.

As there was no place in the vicinity of Craig's residence for the detectives to park without being seen, and as the Jeep appeared to be occupied, they traveled to a nearby business and waited for the Jeep to appear. Approximately 15 minutes later, they saw the Jeep come to a stop at a red light.

Detective Reagan was in contact with Sgt. Mease and other officers and advised them that the detectives had sighted the Jeep. These other officers were part of a crime suppression unit in the Haywood County Sheriff's Office

---

[2] The Government's response (Doc. 350) to the Motion to Suppress states that the Jeep was owned by Christy Helen Trull, who is an additional defendant in this case. The evidence, however, indicated that the owner of the Jeep was Stephanie Trull and the Government acknowledged that the references to Christy Helen Trull in its written filing are incorrect.

and had been involved in other stops in connection with the ongoing methamphetamine trafficking investigation.

Sgt. Mease and Deputy Stoller were in their respective patrol vehicles near Asheville Highway inside Haywood County. Detective Reagan and Detective Phillips followed the Jeep as it traveled through Buncombe County toward Haywood County and paced the vehicle traveling at 60 miles per hour in a 50 miles per hour speed zone. Shortly after the vehicle crossed into Haywood County, Detective Reagan and Detective Phillips went elsewhere to attend to other matters and Sgt. Mease began conducting surveillance on the Jeep. Specifically, when the Jeep passed his location, Sgt. Mease began following the vehicle, paced it traveling at 57 miles per hour in a 50 miles per hour zone, and activated his blue lights.[3]

The Jeep took the next available turn after Sgt. Mease activated his blue lights and came to a stop. Sgt. Mease parked behind the Jeep in a perpendicular fashion.[4]

---

[3] Sgt. Mease testified that the traffic stop was part of the larger investigation and was based in part on the information obtained from law enforcement's interactions with Carver the night before, but that speeding was the specific basis on which he conducted the traffic stop of the Jeep.

[4] Consequently, the video footage of the stop is seen through the right front and rear windows of Sgt. Mease's patrol vehicle.

6

Sgt. Mease then called in the Jeep's license plate to dispatch and approached the vehicle. Defendant was seated in the driver's seat and Trull was in the front passenger's seat.

Sgt. Mease had a long personal relationship with Defendant; he testified that he had known Defendant for 50 years, that the two of them had grown up together and had attended church together, that they knew each other's families, and that they had lived near each other for a 10-year period. Sgt. Mease also knew that Defendant had a history of being involved with drugs. Sgt. Mease had himself interacted with Defendant in his capacity as a law enforcement officer numerous times over the years, including responding to an overdose at Defendant's residence in 2016.

Sgt. Mease requested Defendant's driver's license and identification and asked Defendant to identify Trull. Sgt. Mease then recognized Trull and recalled interacting with her in the past as well, also pertaining to drug activity.

Deputy Stoller arrived soon after the stop began, stood on the passenger side of the Jeep, and watched the occupants for officer safety.

Sgt. Mease informed Defendant that he had been stopped for speeding. Defendant responded by saying he did not think he was going "that fast" but Trull stated she had told Defendant he was speeding. Sgt. Mease then returned

7

to his patrol vehicle to conduct warrant checks and to validate Defendant's driver's license.

Radio communications among law enforcement officers during this time included speculation that Trull had controlled substances hidden in a knee brace she was wearing. In addition, Sgt. Mease radioed that he hoped Deputy Smith and his K-9 were on the way.[5]

Sgt. Mease exited his vehicle and asked Defendant to move the Jeep a short distance so that they would be farther away from the roadway.

Afterwards, Sgt. Mease returned to his patrol car and continued the tasks normally associated with a traffic stop, such as checking the Jeep's registration and Defendant's license number and determining whether any warrants were outstanding for Defendant or Trull.

Sgt. Mease also testified that, during his early interactions with Defendant, he noticed that Defendant seemed "a little shaky" and that this presentation was out of character for Defendant and made Sgt. Mease suspicious.

---

[5] Though it is unclear which officer requested Deputy Smith's assistance, the Government's evidence indicated that Deputy Smith was in the area at the time and was available to be contacted by any officer.

8

Sgt. Mease subsequently provided information on Defendant and Trull to dispatch and, to double check the results, entered the information into the CJLEADS database using the mobile onboard computer in his patrol vehicle.

Deputy Stoller approached Sgt. Mease and advised that Defendant and Trull were playing video games on their cell phones and that they appeared to be calm.

Subsequently, dispatch confirmed that there were no active warrants for Defendant or Trull, that Defendant's driver's license was valid, and that the Jeep was properly registered to Trull. Sgt. Mease then began typing out a warning ticket using the equipment in his patrol vehicle

While he was doing so, Deputy Smith and his dog arrived. Sgt. Mease told Deputy Smith what had transpired and expressly stated that he wanted to finish the traffic stop before Deputy Smith deployed Bruno. Sgt. Mease then completed the warning ticket and served it on Defendant. According to the video footage, this action occurred approximately twelve-and-a-half minutes after the stop began. The Government's witnesses testified that this amount of time is reasonably necessary to conduct the checks typically associated with a traffic stop.

Sgt. Mease then asked for consent to search the vehicle. When that request was denied, Sgt. Mease directed Defendant and Trull to step out of the Jeep and to remove a dog that was also in the vehicle.

9

After they did so, Deputy Smith deployed Bruno to conduct an open-air sniff around the Jeep. Deputy Smith testified that he relied on Sgt. Mease for reasonable suspicion to extend the stop after the speeding infraction had been addressed. While the dog sniff was being conducted, Sgt. Mease, Defendant, and Trull were standing approximately 20 feet away.

Deputy Smith testified that the first time around the car, Bruno's behavior changed around the open window on the driver's side, though he did not give a final alert at that time. The dog did, however, give a final passive alert (by sitting on the ground) after smelling the seams of the passenger's side door. On the second time around the Jeep, Bruno would not leave the window on the driver's side. Deputy Smith then allowed Bruno into the interior of the Jeep. The Government's evidence indicated that such a maneuver is commonly performed to help officers pinpoint the location of suspected narcotics. The dog alerted to the center console between the front seats.

Subsequently, Deputy Stoller searched the Jeep and located three oxycodone pills wrapped in a napkin and an orange pill bottle containing approximately one third of a gram of suspected methamphetamine, all in the center console. In response to that discovery, Defendant said "they" (presumably meaning the oxycodone pills) were for his back pain. Sgt. Mease asked Defendant and Trull who was going to take responsibility for the pill bottle, and Trull said "I guess it's mine, I don't know," though she had to ask

10

what was in the bottle. Thereafter, Defendant stated "You know it's yours, it ain't mine."

Trull was searched by Detective Cagle. Marijuana was found in Trull's purse and she was arrested for possession of methamphetamine.

Sgt. Mease then told Defendant that he (Sgt. Mease) needed to search Defendant. According to Sgt. Mease, the atmosphere during the encounter had been amicable up until this time, with Defendant and Sgt. Mease engaging in small talk and discussing their families, but the tension increased significantly when he advised Defendant that he would be searched. Specifically, Sgt. Mease testified that Defendant became more confrontational, and stated that Sgt. Mease was not going to search him. As Sgt. Mease approached however, Defendant advised Sgt. Mease that he had a pistol in his pocket.

Sgt. Mease then recovered a loaded .22 Magnum mini revolver from Defendant's pants pocket. A further search of Defendant revealed methamphetamine, and an additional secondary search of Defendant by Deputy Stoller revealed additional methamphetamine in Defendant's pocket. Trull did not admit to knowing about the firearm or the methamphetamine recovered from Defendant's person, though Sgt. Mease believed she was not truthful in that regard.

## III. Analysis

"A traffic stop constitutes a seizure under the Fourth Amendment and is subject to review for reasonableness." <u>United States v. Hill</u>, 852 F.3d 377, 381 (4th Cir. 2017) (internal quotation marks omitted).

"Because a traffic stop is more akin to an investigative detention than a custodial arrest, . . . the constitutionality of such a stop" is analyzed "under the two-prong standard enunciated in <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." <u>United States v. Williams</u>, 808 F.3d 238, 245 (4th Cir. 2015). Specifically, courts consider "(1) if the stop was legitimate at its inception, and (2) if the officer's actions during the seizure were reasonably related in scope to the basis for the traffic stop." <u>United States v. Bowman</u>, 884 F.3d 200, 209 (4th Cir. 2018) (internal quotations and citations omitted).

### A. Extension of the Stop

Here, the Government concedes that the mission of the stop should be considered traffic enforcement. Defendant does not contest the legality of the initial stop. See Doc. 308 at 2 n. 1. Rather, he argues that the traffic stop was unlawfully prolonged in violation of the Fourth Amendment.

An investigatory stop "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of the stop. <u>Illinois v. Caballes</u>, 543 U.S. 405, 407 (2005).

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 575 U.S. 348, 354 (2015). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 355 (internal citations omitted).

"An officer's inquiries into matters unrelated to the justification for the traffic stop…do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009); see also United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (quoting United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011) (internal quotation marks omitted) (an "officer's focus must remain on the bases for the traffic stop, in that the stop must be 'sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure'")).

"Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez, 575 U.S. at 354; see also Caballes, 543 U.S. at 407 ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful

if it is prolonged beyond the time reasonably required to complete that mission").

A law enforcement officer may prolong a stop beyond its original purpose, but only with additional authorization; "an officer cannot investigate 'a matter outside the scope of the initial stop' unless he receives the motorist's consent or develops reasonable, articulable suspicion of ongoing criminal activity." Palmer, 820 F.3d at 649-50 (citation omitted); Rodriguez, 575 U.S. at 355 (an officer may not conduct unrelated checks "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual").

"Reasonable suspicion is a 'commonsense, nontechnical' standard that relies on the judgment of experienced law enforcement officers, 'not legal technicians.'" Palmer, 820 F.3d at 650 (quoting Ornelas v. United States, 517 U.S. 690, 695 (1996) (internal quotation marks omitted)). "[T]he factors supporting reasonable suspicion during a traffic stop 'must in their totality serve to eliminate a substantial portion of innocent travelers,' and also demonstrate a connection to criminal activity." Id. (quoting United States v. Williams, 808 F.3d 238, 246 (4th Cir. 2015) (internal quotation marks omitted)).

In this case, the Government argues that Sgt. Mease had reasonable suspicion to extend the stop based on the cumulative information known to him at the time.

Defendant disagrees and contends that the stop should have been completed immediately after dispatch returned information to Sgt. Mease regarding warrant checks and the identification of the occupants of the Jeep. Defendant further argues that any information learned from Carver was uncorroborated, that the confidential informant's November 2 tip was factually inaccurate, and that Sgt. Mease's statement that Defendant seemed "a little shaky" was an insufficient basis upon which to extend the traffic stop.

At the time Sgt. Mease initiated the traffic stop of Defendant, he was aware of the November 1 stop of Carver, the discovery of a significant amount of suspected methamphetamine during that stop, and Carver's statements that she had picked up the methamphetamine from Craig and was delivering it to Defendant, who had previously purchased the methamphetamine. He was also aware of the larger drug trafficking investigation and the confidential informant's information that Defendant would be meeting with Craig on November 2 to purchase additional methamphetamine. Further, Sgt. Mease testified that he had known Defendant personally for 50 years, and that when he approached the Jeep on November 2, Defendant seemed more nervous than he had been during past encounters.

15

Defendant is correct that the events of November 2 did not unfold exactly as the confidential informant had indicated; Defendant did not meet with Craig at the Taco Bell restaurant. However, the undersigned is not persuaded that the information provided by the informant should be discounted entirely, as Defendant was in a Jeep which was observed at Craig's residence and belonged to Trull.

Further, though Deputy Stoller and Sgt. Mease differ somewhat in their accounts of Defendant's nervousness, Deputy Stoller's report that Defendant and Trull appeared calm and were playing games on their phones came several minutes into the encounter, while Sgt. Mease noted Defendant's nervousness upon his initial approach of the Jeep. Sgt. Mease also testified that, in his experience, a suspect's level of nervousness can decrease as a traffic stop progresses. Sgt. Mease's observation that Defendant was unusually nervous is also noteworthy considering his extensive personal history with and knowledge of Defendant over the course of multiple decades.

Under these circumstances, the totality of the information available to Sgt. Mease prior to the time the tasks ordinarily associated with the traffic stop were completed or reasonably should have been completed provided reasonable suspicion to extend the stop. United States v. Branch, 537 F.3d 328, (4th Cir. 2008) ("Courts must look at the 'cumulative information available' to the officer, and not find a stop unjustified based merely on a 'piecemeal

refutation of each individual' fact and inference") (internal citation omitted);

United States v. Melvin, No. 5:17-CR-00357-FL-1, 2019 WL 2252013 (E.D.N.C. Feb. 15, 2019), recommendation adopted, 2019 WL 1761544 (E.D.N.C. April 22, 2019) (officer had both reasonable suspicion and probable cause to extend a traffic stop to conduct a dog sniff where stopping officer, through the collective knowledge of DEA task force officer, had specific information to believe that defendant was involved in drug trafficking at the time of the stop); see also United States v. Jordan, 952 F.3d 160, 166 (4th Cir. 2020).

## B. The Dog Sniff

"Probable cause to search a vehicle exists when 'reasonable officers can conclude that what they see, in light of their experience, supports an objective belief that contraband is in the vehicle.'" United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013) (quoting United States v. Ortiz, 669 F.3d 439, 446 (4th Cir.2012)).

Here, Defendant questions the reliability of the dog sniff to provide probable cause to search the vehicle. Specifically, Defendant argues that, even if the dog search was "lawfully initiated," there is insufficient evidence to show that Deputy Smith and Bruno were "sufficiently trained to provide probable cause." Doc. 308 at 8.

During the hearing, the Government presented evidence regarding Bruno's reliability. Specifically, Deputy Smith testified that he is the first and

only handler that Bruno has had and, at the time of the hearing, had been with Bruno for more than seven years. He and Bruno have been certified every year since 2015 by the United States Police Canine Association and participate in regular canine training for approximately 240 hours per year. Bruno has been deployed 318 times, and on average approximately 4 times per month. In the instances in which Bruno has alerted, narcotics have been found approximately 90% of the time. The Government also submitted training certifications for the years 2015 – 2021 for Bruno and Deputy Smith.

This evidence sufficiently supports the Government's position that Bruno was appropriately reliable to conduct the dog sniff. See United States v. Age, 447 Fed. Appx. 470, 471-72 (4th Cir. Sept. 29, 2011) (unpubl.) ("Assuming, without deciding, that we would require specific evidence of a dog's reliability before permitting his alert to provide probable cause, we find sufficient evidence in this case. The Government provided evidence regarding the dog's detailed training and continuing certification. Moreover, the officer testified that he had worked with the dog for years, and the dog's alerts were 80–90% correct"); United States v. Stanley, 4 Fed. Appx. 148, 150 (4th Cir. Feb. 6, 2001) (unpubl.); United States v. Christian, 452 Fed. Appx. 283, 286 (4th Cir. Nov. 4, 2011) (unpubl.) ("the credibility of a dog's alert rests 'almost entirely on the credibility of the dog handler's testimony [b]ecause the handler is the only witness who can speak to the subjective interaction during a particular dog

18

alert'") (quoting United States v. Howard, 621 F.3d 433, 449 (6th Cir. 2010), cert. denied, --U.S. --, 131 S.Ct. 1623, 179 L.Ed.2d 514 (2011).

"Having a trained dog sniff the perimeter of a vehicle that has been lawfully stopped in a public space is not a search for purposes of Fourth Amendment analysis." United States v. Jenkins, No. 2:18-cr-30, 2019 WL 2283921, at * 2 (N.D. W. Va. May 29, 2019) (citing United States v. Place, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)). Further, a positive alert by a trained canine constitutes probable cause for a search of a vehicle. U.S. v. Jeffus, 22 F.3d 554, 557 (4th Cir. 1994) ("Having the trained dog sniff the perimeter of Jeffus' vehicle, which had been lawfully stopped in a public place, did not of itself constitute a search. When the dog 'alerted positive' for the presence of drugs, the officer was given probable cause for the search [of defendant's vehicle] that followed") (citing United States v. Place, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983)); see also U.S. v. Brooks, 376 Fed. Appx. 300, 2010 WL 1767449, at * 1 (4th Cir. May 4, 2010) (unpubl.) (same).

With respect to the events of November 2, Deputy Smith testified that, on his first pass around the Jeep, Bruno's behavior changed around the open window on the driver's side, and that he gave a final passive alert (by sitting on the ground) after smelling the seams of the passenger's side door. Then, on the second time around the Jeep, the dog would not leave the window on the

19

driver's side. Considering the information regarding the dog's training and certification, the undersigned finds that Bruno's alerts were sufficiently reliable to support probable cause to search the Jeep. See United States v. Wilson, 278 F.R.D. 145, 154 (D. Md. 2011) ("Evidence of a dog's 'training and certification [is] enough by itself to establish [the dog's] reliability so that his positive alerts for controlled substances establish [ ] probable cause.'") (quoting United States v. Koon Chung Wu, 217 Fed.Appx. 240, 245 (4th Cir. 2007) (per curiam)).

### C. The Search of Defendant's Person

Finally, Defendant argues that probable cause to search him was lacking. See Doc. 308 at 8 ("Probable cause to believe that one occupant of a car possessed contraband within it, at least where the ownership and control of the contraband is known to the police, does not authorize a search of other occupants of the car").

In support of this position, Defendant relies on United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210) (1948), while the Government contends this matter is more analogous to Maryland v. Pringle, 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003).

In Di Re, a federal investigator had been told by an informant that the informant was going to buy counterfeit gasoline ration coupons from an individual named Buttitta at a particular place. The investigator went to that

location and found a vehicle with Buttitta in the driver's seat, Di Re in the front passenger seat, and the informant in the back seat. The informant told the investigator that Buttitta had given him counterfeit gasoline ration coupons. Thereafter, all three occupants were arrested. The Supreme Court explained that at the time of the stop, the investigator had no information pointing to Di Re's possession of counterfeit coupons and that "whatever suspicion might result from Di Re's mere presence" in the vehicle was "diminished, if not destroyed" when the informant singled out Buttitta as the only guilty person. 332 U.S. at 594.

In <u>Pringle</u>, a car was stopped for speeding at 3:16 a.m. and searched with the driver's consent. The search revealed $763 in cash in the glove compartment and five plastic baggies containing cocaine behind an armrest in the backseat. At the time of the stop, the vehicle was occupied by three people – the driver, Pringle in the front passenger's seat, and a third man in the back seat. Upon questioning, none of the three men offered any information with respect to ownership of the cocaine or the money. The Court noted that a passenger in a car "'will often be engaged in a common enterprise with the driver, and have the same interest concealing the fruits or evidence of their wrongdoing.'" <u>Id</u>. at 373 (quoting <u>Wyoming v. Houghton</u>, 526 U.S, 295, 304-305, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999)). Further, unlike the situation presented in <u>Di Re</u>, no "singling out" occurred because "none of the three men

provided information with respect to the ownership of the cocaine or money."
Id. at 374. The Court concluded that it was "an entirely reasonable
inference...that any or all three of the occupants had knowledge of, and
exercised dominion and control over, the cocaine" such that a reasonable officer
could conclude there was probable cause to believe Pringle had committed the
crime of possession of cocaine. Id. at 372.

The facts of the instant case fall somewhere between those considered in
Di Re and Pringle. See United States v. Flores-Reyes, No. 8:17-cr-00382-PX,
2019 WL 7281951, at *4 (D. Md. Dec. 27, 2019) (considering whether particular
facts of that case were closer to Pringle or Di Re based on "whether the totality
of the evidence available to law enforcement at the time singled out one
occupant as the culpable possessor of the drugs found"). The undersigned
concludes, based on the particular facts presented here, that this case is more
closely analogous to Pringle.

First, the information known to Sgt. Mease at the time of the November
2 stop, as discussed above, included the confidential informant's tip that
Defendant (not Trull) would be operating a black Jeep belonging to Trull and
would be meeting with Craig to purchase methamphetamine. Additionally,
Sgt. Mease was aware of Carver's statement that she was attempting to deliver
to Defendant on November 1 a quantity of methamphetamine that he had

purchased from Craig. Further, Sgt. Mease, who had known Defendant for decades, testified that Defendant seemed nervous at the beginning of the stop.

Additionally, the methamphetamine found in the Jeep was located in the front center console. Both Defendant and Trull had access to the console and the three oxycodone pills, which Defendant did claim, were found there.

Finally, although Trull claimed ownership of the methamphetamine found in the Jeep, her statement was equivocal; she "guessed" it was hers and had to ask what was in the pill bottle.

Accordingly, "this is not a case where mere propinquity to others independently suspected of criminal activity is advanced as the basis for probable cause…or where one individual present in an automobile with the defendant has been single[d] out as the guilty person, effectively exculpating the defendant." United States v. Myers, 986 F.3d 453, 457-458 (4th Cir. 2021) (finding no "singling out" occurred where neither the driver nor defendant provided information regarding ownership of drugs found in the vehicle and "the contextual facts revealed clearly that [defendant] and the driver knew each other, or at least had a preexisting arrangement, and that they proceeded in concinnity with knowledge of each other's actions") (internal citations and quotations omitted); see also United States v. Major, 341 Fed. Appx. 549, 551 (11th Cir. Aug. 11, 2009) (unpubl.) (officers had probable cause to arrest defendant where defendant, who was a passenger in the vehicle, had access to

the contents of a duffle bag containing drugs and was in the vehicle "at the precise time and place [the driver] was scheduled to make a significant cocaine sale" per information from a confidential informant); cf. Flores-Reyes, 2019 WL 7281951, at *5 (case was closer to Di Re where there was no evidence that defendant knew or had access to the narcotics found in the vehicle at the time of defendant's arrest, and the drugs were located in an area that was physically separated from defendant).

## IV. Recommendation

Based on the foregoing, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress (Doc. 308) be **DENIED**.

Signed: March 25, 2022

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(B), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).